UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
CHRISTIAN AMBROSI,                    :
                                      :
          Plaintiff,                  :
                                      :        06-CV-8163(BSJ)
               v.                     :
                                      :        **Opinion & Order**
1085 PARK AVENUE LLC., RUDIN          :
MANAGEMENT CO., INC. and              :
ROCKLEDGE SCAFFOLD CORP.,             :
                                      :
                    Defendants.       :
------------------------------------x
1085 PARK AVENUE LLC., and RUDIN      :
MANAGEMENT, CO.,                      :
                                      :
          Third Party Plaintiffs,     :
                                      :
               v.                     :
                                      :
AM&G WATERPROOFING, LLC.,             :
                                      :
          Third Party Defendant.      :
------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9/25/08

**BARBARA S. JONES**
**UNITED STATES DISTRICT JUDGE**

Plaintiff Christian Ambrosi, an Ecuadorian citizen,[1] brings

this diversity action against Defendants 1085 Park Avenue LLC,

Rudin Management Company (individually "1085" and "Rudin,"

respectively; collectively "Movants"), and Rockledge Scaffold

Corporation ("Rockledge"), all New York businesses, for

violations of New York State Labor Law sections 240(1), 241(6),

200, and common law negligence.  Included among the damages

---

[1] At the time of the incident that underlies his claims, Plaintiff was — and
in the Court's knowledge still is — an undocumented alien residing illegally
in the United States.  See Ambrosi Dep. 9:16-18.

Plaintiff seeks are future lost wages. Defendants Rudin and 1085 have made cross-claims against Rockledge for contribution, common law and contractual indemnity, and breach of contract. Rockledge has set forth cross-claims against 1085 and Rudin for contribution and common-law indemnity. Furthermore, Rudin and 1085, as third-party plaintiffs, bring cross-claims against third-party defendant AM&G Waterproofing, LLC ("AM&G") for contribution, contractual indemnity, and breach of contract.

Presently before the Court is the motion of Defendants 1085 and Rudin for summary judgment pursuant to Federal Rule of Civil Procedure 56. Movants seek summary judgment granting their contractual indemnification claim against AM&G and dismissing Plaintiff's claims under Labor Law sections 240(1), 241(6), 200, as well as his negligence claim. Furthermore, should Plaintiff's substantive claims survive summary judgment, Movants ask that the Court grant them summary judgment dismissing his claim for lost wages. For the reasons set forth below, 1085 and Rudin's motion is GRANTED with respect to their contractual indemnification against AM&G, GRANTED with respect to Plaintiff's negligence and Labor Law § 200 claims, DENIED with respect to Plaintiff's and Labor Law sections 240(1) and 241(6)

claims, and GRANTED with respect to Plaintiff's claim for lost wages.[2]

## FACTS

On September 13, 2006, Plaintiff — who was at that time an employee of AM&G — suffered severe and permanent injuries when he fell from a sidewalk bridge, the surrounding enclosure of which gave way. Movants' Rule 56.1 Stmt. ¶ 1; Pl.'s Rule 56.1 Stmt. ¶ 1; see Pl.'s Affirmation in Opp'n Ex. 11 at 3. AM&G had contracted with Rockledge to build this sidewalk bridge — a twelve-foot high temporary platform above the sidewalk serving a residential apartment complex at 1085 Park Avenue in Manhattan. Movants' Rule 56.1 Stmt. ¶ 4; Pl.'s Rule 56.1 Stmt. ¶ 4; Pl.'s Affirmation in Opp'n Ex. 1 at 1-2; Harrington Dep. 13:3-11, 41:14-19, Apr. 9, 2007. Defendant 1085 was the corporate owner of the apartment complex, and Rudin, as 1085's agent, had contracted with AM&G for brick restoration and waterproofing work near the roof of the building. Movants' Rule 56.1 Stmt. ¶¶ 2, 3; Pl.'s Rule 56.1 Stmt. ¶¶ 2, 3; Hargadon Dep. 12:20-13:2, Mar. 29, 2007.

---

[2] In an order dated July 26, 2007, Magistrate Judge Maas denied Plaintiff's application to serve and file an untimely cross-motion for summary judgment, Docket Entry No. 26 at 1, and the Court now declines Plaintiff's invitation to render summary judgment sua sponte, finding a jury necessary to determine several outstanding questions of fact, as set forth in greater detail below. See Wojcik v. 42nd St. Dev. Project, 386 F. Supp. 2d 442, 447 n.3 (S.D.N.Y. 2005).

At least one purpose of the sidewalk bridge, also called a "sidewalk shed," was to protect pedestrians from falling objects. Movants' Rule 56.1 Stmt. ¶ 24; Pl.'s Rule 56.1 Stmt. ¶ 24. At the time of his fall, however, Plaintiff was atop the sidewalk bridge, using it as a staging area for materials as per instructions from AM&G employees. Movants' Rule 56.1 Stmt. ¶¶ 6-10, 19-20; Pl.'s Rule 56.1 Stmt. ¶¶ 6-10, 19-20. Using a rope and a bucket, Plaintiff and his co-workers had manually hoisted bricks up from the sidewalk to the deck of the sidewalk bridge. Movants' Rule 56.1 Stmt. ¶¶ 9-10; Pl.'s Rule 56.1 Stmt. ¶¶ 9-10. Plaintiff's co-workers would tie one end of the rope to the ground-level bucket filled with about 10 bricks, and then sling the rope over the "parapet wall," i.e., the plywood enclosure surrounding the sidewalk bridge. Movants' Rule 56.1 Stmt. ¶¶ 9-10; Pl.'s Rule 56.1 Stmt. ¶¶ 9-10; Ambrosi Dep. 52:18-53:11, 121:9-121:23, Mar. 21, 2007; Leonard Dep. 22:15-24:12, 80:7-81:3, Nov. 20, 2006. Plaintiff, along with other co-workers atop the sidewalk bridge, would pull the other end of the rope until the bucket was up to the sidewalk bridge. Movants' Rule 56.1 Stmt. ¶ 10; Pl.'s Rule 56.1 Stmt. ¶ 10. The AM&G workers used this technique successfully to lift about 1,500 bricks onto the sidewalk bridge. Leonard Dep. 23:21-22.

Once all the bricks were atop the sidewalk bridge, the workers attempted to use the same manual hoisting technique to

4

lift a handcart onto the sidewalk bridge. Movants' Rule 56.1
Stmt. ¶¶ 7-8; Pl.'s Rule 56.1 Stmt. ¶¶ 7-8; Leonard Dep. 24:18-
25:10; Ambrosi Dep. 60:19-61:12. However, as Plaintiff was
pulling the rope, the wall gave way while the handcart was
suspended in mid-air, and Plaintiff fell to the ground below.
Movants' Rule 56.1 Stmt. ¶¶ 6-7; Pl.'s Rule 56.1 Stmt. ¶¶ 6-7;
Leonard Dep. 25:3-26:14; Ambrosi Dep. 65:14-67:13. Ropes and
harnesses were not available at the worksite to anchor the
workers. Pl.'s Rule 56.1 Stmt. ¶ 53; Vogler Dep. 21:6-19,
59:14-25, Apr. 10, 2007; Ambrosi Dep. 120:3-13; Leonard Dep.
76:16-24; Hargadon Dep. 40:8-22.

**DISCUSSION**

**I.    Standard of Review on Motion for Summary Judgment**

Rule 56 of the Federal Rules of Civil Procedure provides
that a court shall grant a motion for summary judgment "if the
pleadings, the discovery and disclosure materials on file, and
any affidavits show that there is no genuine issue as to any
material fact and that the movant is entitled to judgment as a
matter of law." Fed. R. Civ. P. 56(c). "The party seeking
summary judgment bears the burden of establishing that no
genuine issue of material fact exists and that the undisputed
facts establish her right to judgment as a matter of law."
Rodriguez v. City of New York, 72 F.3d 1051, 1060-61 (2d Cir.
1995). The substantive law governing the case will identify

those facts that are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In determining whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 37 (2d Cir. 1994).

## II. New York Labor Law Section 240(1)

New York's Scaffold Law, as set forth in New York Labor Law section 240(1) entitled "Scaffolding and other devices for use of employees," reads:

> All contractors and owners and their agents . . . in the . . . repairing, altering, . . . or pointing of a building or structure shall furnish or erect, or cause to be furnished or erected for the performance of such labor, scaffolding, hoists, stays, ladders, slings, hangers, blocks, pulleys, braces, irons, ropes, and other devices which shall be so constructed, placed and operated as to give proper protection to a person so employed.

N.Y. Lab. Law § 240(1) (McKinney 2008). Since its enactment, New York courts have read the Scaffold law liberally to comport

6

with the legislative mandate: placing "ultimate responsibility for safety practices at building construction jobs where such responsibility actually belongs, on the owner and general contractor." Rocovich v. Consol. Edison Co., 78 N.Y.2d 509, 513 (1991) (quoting 1969 N.Y. Legis. Ann., at 407) (internal quotation marks omitted).

Where construction workers are at risk of falling from an elevation while performing their work, section 240(1) places an absolute, nondelegable duty on owners to protect workers with appropriate safety devices. See id. at 513-14. The liability imposed is "absolute" in the sense that a plaintiff's comparative fault will not reduce his award, and liability does not require that an owner or general contractor exercise any control or supervision over the worksite, or have notice of an unsafe condition. See Pollack v. Safeway Steel Prods., Inc., 457 F. Supp. 2d 444, 450-51 (S.D.N.Y. 2006); Blake v. Neighborhood Hous. Servs. of N.Y. City, Inc., 1 N.Y.3d 280, 287-88 (2003). However, the statute does not impose liability without fault. See Blake, 1 N.Y.3d at 289-90. Liability requires that a culpable defendant's violation of the statute be a proximate cause of the plaintiff's injury. Id. at 289.

## A. Section 240(1) applies.

Rudin and 1085 argue that, unlike the devices listed in the statute, the sidewalk bridge here was never intended to protect

workers from falling.  Rather, it was "designed and installed for the purpose of protecting pedestrians."  Morfopoulos Aff. ¶ 5; see Harrington Dep. 21:11-22:6.  From this, Movants assert that the sidewalk bridge is distinct from the devices listed in the statute, and ought not to be counted among them.

However, the prerequisite for application of section 240(1) is that a construction worker face a risk of falling from a significant height in performing his work.  See Rocovich, 78 N.Y.2d at 514 ("[Section 240 contemplates] risks related to elevation differentials.").  Here, there is no dispute that the Plaintiff's task was to hoist bricks and a handcart onto the twelve-foot high sidewalk bridge, which was used as a staging area.  Thus, Plaintiff's "particular . . . task create[d] an elevation-related risk of the kind that the safety devices listed in section 240(1) protect against."  Broggy v. Rockefeller Group, Inc., 8 N.Y.3d 675, 681 (2007).

Moreover, the Appellate Division has applied section 240(1) to sidewalk bridges on several occasions.  See, e.g., Jablonski v. Everest Constr. & Trade Corp., 693 N.Y.S.2d 229, 229 (App. Div. 1999) (per curiam).  In Jablonski, the Appellate Division characterized the sidewalk bridge as a "form" of scaffolding for purposes of section 240(1).  Id.  Sheltering pedestrians and protecting workers are not mutually exclusive.  See id.  This is especially true here, where Rockledge designed the sidewalk

bridge to support material storage and attending workers.  Pl.'s

Affirmation Opp'n ¶ 3; see Movants' Affirmation Ex. V

(mechanical drawing of "heavy duty" sidewalk bridge capable of

withstanding 300 pounds per square foot).  Thus, whether the

sidewalk bridge is called "scaffolding" or one of the "other

devices" mentioned in the statute, Movants had an absolute duty

under section 240(1) to ensure the sidewalk bridge's adequacy as

a safety device.[3]

### B. A question of fact exists as to whether Movants violated the statute, precluding summary judgment.

Movants next argue that there were no shortcomings in the

sidewalk bridge's (or its parapet wall's) construction of the

sort that New York courts recognize as violating Labor Law

section 240(1).  Relying on Morales v. Spring Scaffolding, Inc.,

802 N.Y.S.2d 41 (App. Div. 2005), Movants assert that a

violation requires a finding of improper materials.  Movants'

Mem. L. at 6.  However, in that case, the court did not find

that violations must be predicated on improper materials.

Indeed, that court granted the plaintiff's motion for summary

judgment on his section 240(1) claim, citing the parapet wall's

---

[3] Even if the sidewalk bridge and its parapet wall were not within the statute, Rudin and 1085 would be liable for failing to provide any safety devices whatsoever.  See Zimmer v. Chemung County Performing Arts, Inc., 65 N.Y.2d 513, 523 (1985) ("[Under section 240(1)], where an owner or contractor fails to provide any safety devices, liability is mandated by the statute without regard to external considerations such as rules and regulations, contracts or custom and usage."); see also Ramos v. Port Auth. of N.Y. & N.J., 761 N.Y.S.2d 57, 57 (App. Div. 2003) ("The failure to provide [any] safety devices constitutes a per se violation of [§ 240(1)].").

deficient height and use of wooden framing thinner than that specified in its design plans. See Morales, 802 N.Y.S.2d at 45-46. The Morales court never characterized either violation as a use of improper materials, or even used that phrase. See id.

Instead, there are two ways in which an elevation device may fail to provide proper protection, and thus violate the statute. First, a required safety device may be absent from the worksite entirely. See Blake, 1 N.Y.3d at 289. Or, the device may "prove[] inadequate to shield the injured worker from harm" occasioned by a fall. Ross v. Curtis-Palmer Hydro-Elec. Co., 81 N.Y.2d 494, 501 (1993); see Gordon v. E. Ry. Supply, Inc., 82 N.Y.2d 555, 561 (1993). Here, Plaintiff has adduced evidence to show that the parapet wall was only twenty-nine inches, contravening the forty-two inch requirement set forth in New York's Industrial Code. See, e.g., Rubinstein Aff. ¶¶ 5-6; Pl.'s Affirmation Opp'n Ex. 6; see also New York Industrial Code, N.Y. Comp. Codes R. & Regs. tit. 12, § 23-1.18(b)(2) (2008). Plaintiff has also pointed to evidence supporting his assertion that the wall was inadequately braced, or not braced at all, contrary to New York City Building Code requirements.[4]

---

[4] Movants contend that code violations cannot serve as a basis for a § 240(1) claim. Movants' Reply Aff. ¶ 13. Such violations do, however, have a role in a § 240(1) analysis, although they are not conclusive. See Morales, 802 N.Y.S.2d at 45-46 (looking to deviations from the Administrative Code and the defendant's own schematics to help determine liability). It is unnecessary that such deviations lead inescapably to a finding of a § 240(1) violation; they need only introduce a factual question of improper protection for a

See Vogler Dep. 48:16-49:5, 106:14-107:10; Pl.'s Affirmation Opp'n Ex. 6; Rubinstein Aff. ¶¶ 5-6; see also Building Code, N.Y. City, N.Y., Code § 27-1021(b)(1) (2004).  Finally, Plaintiff directs the Court to evidence bearing on his claim that no other safety devices that would have prevented Plaintiff's fall — such as ropes or harnesses — were present at Plaintiff's worksite at the time of his injury.  See Ambrosi Dep. 120:3-9; Leonard Dep. 76:16-24.

In their submissions, Movants dispute nearly all of those facts that Plaintiff identified as giving rise to statutory violations.  See Morfopoulos Aff. ¶ 3 ("[T]he sidewalk bridge . . . was erected in accordance with all applicable codes, laws, and standards, including the New York City Administrative Code and New York City Buildings Code.").  However, these issues are for a jury.  Plaintiff's evidence has introduced genuine issues of material fact as to whether the parapet wall's characteristics unduly enhanced the risk of falling and violated the statute.

## C. **A reasonable jury could find that Movants' violations proximately caused the Plaintiff's injury.**

Movants contend that Plaintiff's conduct in the case at bar was the proximate cause of his injuries.  See Movants' Mem. L. at 8; Morfopoulos Aff. ¶ 7.  A defendant is relieved of

jury's resolution.  See Blake, 1 N.Y.3d at 289 n.8 (setting forth summary judgment yardsticks for section 240(1) claims).

liability for a section 240(1) violation only if the plaintiff's conduct is the sole proximate cause of his injury. _Blake_, 1 N.Y.3d at 290. In _Blake_, the New York Court of Appeals held that the plaintiff's negligent misuse of a ladder was the sole proximate cause of his fall, as the ladder was in proper working condition and offered proper protection. _Id._ Where proper safety devices are "entirely sound and in place," liability will not attach as the Legislature did not intend that owners and contractors become insurers of workers' safety. _Id._ at 292.

Here, Movants assert that Plaintiff's use of the parapet wall as a fulcrum to hoist 1,500 pounds of bricks and a handcart was an extraordinary and unforeseeable use, which caused Plaintiff's fall and obviates any technical statutory violation as proximate cause. _See_ Movants' Affirmation ¶ 14; _see_ _also_ Morfopoulos Aff. ¶ 7. However, Plaintiff has met his burden of responding with evidence tending to show a different explanation for the wall's collapse. Plaintiff provides expert testimony that the wall's height and bracing deficiencies likely caused its collapse. _See_ Pl.'s Affirmation Opp'n ¶¶ 13-14; Rubinstein Aff. ¶¶ 5-8. Plaintiff has also set forth evidence supporting his position that, had he been provided with safety equipment such as ropes and harnesses, he would not have sustained any injury. _See_ Pl.'s Affirmation Opp'n ¶ 12; Rubinstein Aff. ¶ 8.

12

Plaintiff additionally claims that his use of the wall to hoist materials ought not be characterized as the sort of misuse that would obviate Movants' statutory violations as proximate causes. Pl.'s Affirmation in Opp'n ¶ 14. To this end, a reasonable juror could rely on Plaintiff's evidence to find that employees had used the sidewalk bridge to hoist materials in the past without incident, see Ambrosi Dep. 100:8-13; Leonard Dep. 87:23-88:13, and that Plaintiff was acting under his supervisor's instructions in hoisting the materials, see Ambrosi Dep. 42:21-43:20, 60:16-24. Thus, Plaintiff's evidence could show Plaintiff's conduct to be a "normal and logical response" to the situation in which he found himself, not an extraordinary or unforeseeable use. Plaintiff thus distinguishes his conduct from those cases in which a plaintiff's conduct was the sole proximate cause of his injuries in Labor Law section 240(1) contexts. See Montgomery v. Fed. Express Corp., 4 N.Y.3d 805, 806 (2005) (granting defendants' motion for summary judgment dismissing plaintiff's section 240(1) claim, where plaintiff's use of a bucket to ascend a rooftop, and a leap to descend, was not a "normal and logical response," as a ladder was available); Pichardo v. Aurora Contractors, Inc., 815 N.Y.S.2d 263, 264-65 (App. Div. 2006) (granting plaintiff's summary judgment motion where his disassembly of an extension ladder and use of an unsafe section was not "extraordinary or unanticipated," mainly

because plaintiff's supervisor ordered the disassembly and subsequent use of the ladder).

Finally, as noted, Rockledge built the sidewalk bridge here to bear material storage. See Movants' Affirmation Ex. V; see also N.Y. City, N.Y., Code § 27-1021(b). From this, Plaintiff argues that the workers' staging of materials counts as a generally intended use of the sidewalk bridge. Plaintiff's evidence also raises a question of fact as to whether conditions at the time and place of Plaintiff's injury made Plaintiff's use of the rope and bucket system, instead of the preferred "high-low" device, or boom, a foreseeable use. See Pl.'s Affirmation Opp'n ¶ 4; Vogler Dep. 97:4-101:19 (timing of delivery and site characteristics dictating need for manual hoisting operation).

In light of the record and the parties' contentions, a jury is needed to determine whether, but for Defendants' violations, Plaintiff would have fallen, or whether Plaintiff's use of the parapet wall to lift materials would have caused its collapse independently of any violations. See Birbilis v. Rapp, 613 N.Y.S.2d 414, 415 (App. Div. 1994) ("[P]laintiff['s showing] constitutes a prima facie case . . . since a collapse would not have occurred if the safety device had been properly constructed so as to give adequate protection."). Where questions of fact exist about proximate causation, juries are necessary to resolve them. See Blake, 1 N.Y.3d at 291 n.10 (citing cases needing

14

juries to resolve proximate causation questions in Labor Law
section 240(1) claims). Here, Plaintiff has sufficiently
identified and supported the existence of an outstanding
question of fact: whether Plaintiff's use of the parapet wall to
lift bricks and a handcart was the sole proximate cause of the
wall's collapse.

For the reasons stated above, Movants' motion for summary
judgment dismissing Plaintiff's Labor Law section 240(1) claim
is DENIED.

## III. **New York Labor Law § 241(6)**

New York Labor Law § 241(6) reads:

> All contractors and owners and their agents . . . when
> constructing or demolishing buildings or doing any
> excavating in connection therewith, shall comply with
> the following requirements:
> \* \* \*
> 6. All areas in which construction, excavation or
> demolition work is being performed shall be so
> constructed, shored, equipped, guarded, arranged,
> operated and conducted as to provide reasonable and
> adequate protection and safety to the persons employed
> therein or lawfully frequenting such places. The
> commissioner may make rules to carry into effect the
> provisions of this subdivision, and the owners and
> contractors and their agents for such work . . . shall
> comply therewith.

N.Y. Lab. Law § 241(6) (McKinney 2008). When a contractor (or
sub-contractor) fails "to comply with the specific safety rules
and regulations promulgated by the Commissioner of the
Department of Labor" in New York's Industrial Code, this statute

15

holds the owner of the premises vicariously liable for all
injuries to construction workers that proximately result.
Pollack, 457 F. Supp. 2d at 449 (quoting Ross, 81 N.Y.2d at 501-
02). Like a Labor Law section 240(1) claim, owners and
contractors need not control or supervise the worksite to be
held liable. Id. at 449, 451. However, unlike Labor Law
section 240(1), owners may raise workers' comparative negligence
as a defense. Id. at 450.

### A. Duty under § 241(6)

Courts have interpreted the statutory language to require
that plaintiffs show a violation of the rules promulgated by the
commissioner, i.e., a specific Industrial Code violation. See,
e.g., Ross, 81 N.Y.2d at 501-03; see also Shannon v. Lake Grove
Centers, Inc., 118 F. Supp. 2d 343, 349 (E.D.N.Y. 2000) (holding
that "a plaintiff must allege the violation of a specific rule
or regulation promulgated by the Commissioner of the Department
of Labor" to state a claim under § 241(6)). The particular
Industrial Code provision violated must "set forth a specific
standard of conduct." Wilson v. City of New York, 89 F.3d 32,
38 (2d Cir. 1996). Only such specific standards confer
nondelegable duties on owners under section 241(6); plaintiffs
may not rely on Industrial Code provisions that set forth
general duties to "provide reasonable and adequate protection
and safety" to support section 241(6) claims. Ross, 81 N.Y.2d

16

at 503 (quoting <u>Bland v. Manocherian</u>, 66 N.Y.2d 452, 460-61 (1985) (internal quotation marks omitted). Thus, provisions requiring, for example, only that an employer take "proper," "substantial," or "effective" measures, are legally insufficient to support section 241(6) claims. <u>See</u> <u>id.</u> at 503-04.

Plaintiff's first contention, that section 241(6) holds owners to a general duty of reasonable care to provide adequate protection and safety for all workers on a job site, is without merit. <u>See</u> Pl.'s Mem. Opp'n at 3. Although the first sentence of section 241(6) requires that workers enjoy "reasonable and adequate protection," the statute then expressly gives the commissioner power to make rules "to carry into effect the provisions of this subdivision," before explicitly directing that "owners . . . shall comply" with those rules. N.Y. Lab. Law § 241(6). Section 241(6) proscribes inadequately safe worksites, but the Industrial Code provides the statute's effect. <u>See</u> <u>Shannon</u>, 118 F. Supp. 2d at 349. Thus, contrary to Plaintiff's assertions, the mere failure of reasonable and adequate protection at a job site is insufficient for liability under section 241(6).

Plaintiff also contends that Defendants violated section 23-1.18(b)(2) of the Industrial Code, which reads:

(b) Sidewalk shed construction.
* * *

17

> (2) The outside edge and the ends of the deck of every
> sidewalk shed shall be provided with a substantial
> enclosure at least 42 inches in height, consisting of
> boards not less than one inch thick laid close, or of
> screening formed of not less than No. 16 U.S. gage steel
> wire mesh with openings which will reject a one and one-
> half inch diameter ball, or of corrugated metal sheet of
> not less than No. 22 U.S. gage or of exterior grade
> plywood not less than one-half inch thick.

N.Y. Comp. Codes R. & Regs. tit. 12, § 23-1.18(b)(2).

The provision on which Plaintiff relies sets forth a precise description of the height and materials required for a parapet wall. Like other provisions courts have found to be adequately specific to give rise to liability, section 23-1.18(b)(2) "mandates a distinct standard of conduct, rather than a general reiteration of common-law principles." Rizzuto v. L.A. Wenger Contracting Co., 91 N.Y.2d 343, 351 (1998). Thus, it is sufficient to create a nondelegable duty on Defendants and support Plaintiff's section 241(6) claim — but only to the extent Plaintiff would base liability on a height deficiency.[5] See Pl.'s Mem. Opp'n at 3-4.

### B. **Application of Industrial Code Section 23-1.18**

Movants contend that a plain reading of the statute shows only that the Board of Standards and Appeals intended to protect

---

[5] To the extent Plaintiff draws on the provision's language requiring a "substantial enclosure" to support his section 241(6), it is dismissed. The Industrial Code defines "substantial" as a "[g]eneral descriptive term[]," meaning "of such kind and quality as a reasonable and prudent man" would deem necessary. N.Y. Comp. Codes R. & Regs. tit. 12, § 23-1.4(a) (2008). This duty is too general to support a § 241(6) claim. See Ross, 81 N.Y.2d at 503-04. Similarly, Plaintiff may not base his section 241(6) claim on any theory of improper bracing, inadequate equipment, or any other alleged breach of a general duty. Id.; see N.Y. Comp. Codes R. & Regs. tit. 12, § 23-1.4(a).

pedestrians from falling debris, not workers from falling to the
ground. Movants' Mem. L. at 10. Otherwise, the statute would
set forth strength requirements; it does not, and the only
reference to impact — the steel mesh's capacity to "reject a one
and one-half inch diameter ball" — implicates the size of
objects falling to the sidewalk below, not the wall's ability to
withstand outside forces. N.Y. Comp. Codes R. & Regs. tit. 12,
§ 23-1.18(b)(2); see Movants' Mem. L. at 10. Thus, Movants
argue, Plaintiff's injury is outside the risk against which the
Board designed the regulation to protect, and Defendants are not
liable as a matter of law. See Movants' Mem. L. at 10-11; see
also De Haen v. Rockwood Sprinkler Co. of Mass., 258 N.Y. 350,
353 (1932).

However, this Court disagrees with Movants' reading. The
provision makes no direct mention of pedestrians or workers.
Movants' assertion that the height and materials requirements
must relate only to protection of pedestrians is conclusory.
Those requirements would serve equally well to protect workers
from falling.

Furthermore, Section 23-1.3 of the Industrial Code,
entitled "Application," contradicts Movants' assertion: Rule 23,
of which Plaintiff's proffered provision is a part, "applies to
persons employed in construction . . . and to the owners,

contractors and their agents obligated by the Labor Law to provide such persons with safe working conditions and safe places to work." N.Y. Comp. Codes R. & Regs. tit. 12, § 23-1.3. It is undisputed that Plaintiff was so employed, that Defendant 1085 was such an owner, and that Rudin was such an agent. Moreover, Section 23-1.2 of the Industrial Code, "Finding of Fact," also sets forth the perceived need to extend special protection to construction workers against various hazards of the job site, including falling. See N.Y. Comp. Codes R. & Regs. tit. 12, § 23-1.2. This provision also pertains to Rule 23. Even if it is not the sole or primary objective of the provision, it is proper to apply it to protect Plaintiff in his work. Thus, a failure of a parapet wall's height or materials that causes a worker to fall from a sidewalk bridge must count among the hazards contemplated in the promulgation of section 23-1.18(b)(2).

### C. **Violation of the provision is a question of fact**.

Movants assert that the panels' four-foot width satisfied the forty-two inch height requirement. Movants' Mem. L. at 10; see Morfopoulos Aff. ¶¶ 3-4, 6. However, Plaintiff's submissions suggest that part of the parapet wall extended beneath the floor of the sidewalk bridge, so that the width of the panels does not reflect the height of the wall. Pl.'s

Affirmation Opp'n ¶ 5. Thus, the true height of the wall was only twenty-nine inches, according to Plaintiff. See id.; see also Pl.'s Affirmation Opp'n Ex. 6; Rubinstein Aff. ¶¶ 5, 8. This question of fact requires a jury's resolution, and resists summary judgment.

**D. A jury could find that violation of the provision was a proximate cause of the Plaintiff's injury.**

In Shannon, the Eastern District held:

> Where a plaintiff can point to [an applicable Industrial Code] provision, failure to comply with that provision constitutes evidence of negligence sufficient to defeat summary judgment and present a claim to a jury. Thereafter, the trier of fact may conclude that plaintiff's injury resulted from negligence and that such negligence was the proximate cause of the injury.

Shannon, 118 F. Supp. 2d at 349. Plaintiff has met this prima facie burden. Plaintiff's proximate cause proofs may be thin, but he has raised a factual question of an applicable Industrial Code violation, and brought expert testimony tending to show that the violation was a proximate cause of his injury. See Pl.'s Mem. Opp'n at 4; Rubinstein Aff. ¶¶ 5, 8. Movants' expert has opined that the wall's collapse resulted only from Plaintiff's use and not from the wall's height, though the Court notes that Movants' affiant assumes that the wall measured forty-two inches high, rather than twenty-nine inches. See Morfopoulis Aff. ¶¶ 6-7. New York courts generally reserve

21

questions of proximate cause for the jury.  See Nowlin v. City
of New York, 81 N.Y.2d 81, 89 (1993); Derdiarian v. Felix
Contracting Corp., 51 N.Y.2d 308, 315 (1980).[6]

Accordingly, in light of these genuine questions of
material fact, Movants' motion for summary judgment on
Plaintiff's section 241(6) claim is DENIED.

## IV.  **New York Labor Law § 200 and negligence**

New York Labor Law § 200, entitled "General duty to protect
the health and safety of employees; enforcement," codifies
owners' common law duty to maintain a safe workplace.  N.Y. Lab.
Law § 200 (McKinney 2008); see Ross, 81 N.Y.2d at 505.  "Courts
generally analyze claims brought under both § 200 and the common
law [of negligence] simultaneously."  Wojcik, 386 F. Supp. 2d at
455 n.15.  Simultaneous analysis is particularly appropriate
where similar facts and theories underlie a plaintiff's section
200 and negligence claims.  See Wojcik, 386 F. Supp. 2d at 455
n.15.  Here, Plaintiff's section 200 and negligence claims
center on the allegedly unsafe parapet wall.  To state a claim

---

[6] Courts tend to dismiss section 241(6) claims on proximate cause grounds where
the regulation on which a plaintiff relies, although suitably specific,
addresses a different risk of harm from that which ultimately befell the
plaintiff.  See, e.g., Dos Santos v. Terrace Place Realty, 433 F.Supp.2d 326,
332-33 (S.D.N.Y. 2006) (finding regulatory violations obviated as proximate
causes in section 241(6) claim where one regulation addressed accidents
involving "public vehicular traffic," and the other "heavy equipment or
machinery used in construction," but plaintiff was injured when co-worker's
passenger sedan struck him at their work site); Kaleta v. N.Y. State Elec. &
Gas Corp., 837 N.Y.S.2d 824, 827 (App. Div. 2007).  Such is not the case
here.

under section 200, a "plaintiff 'must demonstrate the existence of a duty, the breach of which may be considered the proximate cause of the damages suffered by the injured party.'" Dos Santos v. Terrace Place Realty, Inc., 433 F.Supp.2d 326, 333 (S.D.N.Y. 2006) (quoting Becker v. Schwartz, 46 N.Y.2d 401, 410 (1978)). A showing of an owner's exercise of supervisory control over the method a subcontractor employed in connection with a plaintiff's injury is the "sine qua non" of a finding of negligence, without which no duty can attach. Wojcik, 386 F. Supp. 2d at 456; see Ross, 81 N.Y.2d at 505.

Here, Plaintiff admits to taking "his instructions only from [AM&G] employees." Movants' Rule 56.1 Stmt. ¶ 11; Pl.'s Rule 56.1 Stmt. ¶ 11; see Ambrosi Dep. 42:21-43:20. The record leads to only one conclusion: AM&G employees directed and controlled the job site, as well as the means, methods, and equipment Plaintiff and his co-workers used, while Rudin and 1085 played no part, direct or indirect, in equipping, directing, or controlling Plaintiff.[7] See Leonard Dep. 35:18-36:3, 52:23-53:16; Vogler Dep. 15:18-25, 19:5-13, 20:16-25; Ambrosi Dep. 42:21-43:20, 60:16-24; Hargadon Dep. 18:19-19:21; Gluck Aff. ¶¶ 3, 5. Thus, because Movants exercised no control

_____

[7] New York's Workers' Compensation Law prevents Plaintiff from suing AM&G directly; thus, AM&G's only role in this case — that of third party defendant — results from Defendants' impleader. See N.Y. Workers' Comp. Law §§ 11, 29; see also Fung v. Japan Airlines Co., Ltd., 9 N.Y.3d 351, 357 (2007).

over Plaintiff, Movants owed no duty to Plaintiff under section 200, and therefore cannot be held liable.

Accordingly, Movants' motion for summary judgment dismissing Plaintiff's Labor Law section 200 and negligence claims is GRANTED.

## V. 1085 and Rudin's Contractual Indemnification Claim

On August 22, 2006, AM&G and Rudin, acting as 1085's agent, entered into a construction contract whereby AM&G agreed to perform exterior restoration work at 1085's premises. See Movants' Affirmation Ex. F. Movants assert that, pursuant to this contract, they are entitled to complete contractual indemnification. See Movants' Mem. L. at 13. Movants base their contractual indemnification claim on two writings. First, Schedule B to the service contract between Defendants and AM&G reads:

> [AM&G] covenants . . . to defend, protect, indemnify and hold harmless [1085 and Rudin] . . . from and against each and every claim, demand, cause of action, liability, cost, damage, loss . . . or expense . . . made . . . by any person . . . (including . . . [AM&G's] employees . . .) arising out of . . . bodily or personal injury . . . to the extent caused by, resulting from or in any way directly or indirectly incidental to or in connection with the performance of the Work by [AM&G].
> ***
> Nothing contained herein shall be construed to require [AM&G] to indemnify [1085 or Rudin] for [1085's or Rudin's] own negligence.

24

Movants' Affirmation Ex. F (Schedule B at 2 ("Indemnity")).

Second, Defendants and AM&G's separate "Indemnity Agreement" reads:

> For good and valuable consideration . . . [AM&G] agrees to have Rudin [and 1085] . . . named as additionally insured parties for any and all general liability and umbrella/excess liability insurance policies that name [AM&G] as the insured party. Such coverage for such additional insured parties shall be primary and non-contributory, notwithstanding any insurance maintained by such additional insured parties.

Movants' Affirmation Ex. G ("Indemnity Agreement").

The terms of these contracts plainly indicate the parties' intent to vest 1085 and Rudin with a contractual right to indemnification; this Court so finds the parties' intent as a matter of law. See Postlewaite v. McGraw-Hill, Inc., 411 F.3d 63, 67 (2d Cir. 2005) ("In New York, 'if a contract is straightforward and unambiguous, its interpretation presents a question of law for the court to be made without resort to extrinsic evidence.'") (quoting Ruttenberg v. Davidge Data Sys. Corp., 626 N.Y.S.2d 174, 192 (App. Div. 1995)); see also Pollack, 457 F. Supp. 2d at 454 (applying rule in context of construction contracts).

The parties do not dispute such an interpretation of the contracts. However, AM&G alleges that Movants' indemnification claims are barred because it has named Movants as additional

insureds on its general liability policies with either AIG, American Home Assurance Company, or both.[8]  See AM&G's Affirmation Opp'n. ¶ 3.  AM&G argues that because AM&G has named Movants as additional insureds, the rule of "anti-subrogation" is triggered.

The anti-subrogation rule bars an insurer's "right of subrogation against its own insured for a claim arising from the very risk for which the insured was covered."  N. Star Reins. Corp. v. Continental Ins. Co., 82 N.Y.2d 281, 294 (1993). Public policy demands the rule to prevent insurance companies from passing to their insureds the same losses those insureds have paid premiums to prevent.  Id.  The rule also prevents conflicts of interest from arising "that may affect the insurer's incentive to provide a vigorous defense for its insured."  Id. at 295.

Even if AM&G and Movants are co-insureds, as AM&G alleges, that fact alone does not bar Movants' contractual indemnification claim here, despite AM&G's contention.[9]  See AM&G's Affirmation Opp'n. ¶ 3.  The anti-subrogation rule prevents an insured from bringing an indemnification claim

---

[8] Neither insurer is presently defending Movants.  See Movants' Reply Aff. ¶ 44.

[9] AMG's contention implicates, at most, the discredited "pre-indemnification rule," whereby an owner is automatically barred from seeking indemnification whenever a contractor has procured insurance for that owner pursuant to their construction contract.  N. Star Reins. Corp., 82 N.Y.2d at 291-92 (rejecting Michalak v. Consol. Edison Co., 563 N.Y.S.2d 796 (App. Div. 1990) and its progeny for adopting the pre-indemnification rule, an undue "departure from long-standing principles of indemnification.").

against its co-insured under the same policy – but only when "its claim [is] asserted on behalf of the insurer, the real party in interest," i.e., when an insurer has held harmless and paid out to the insured nominally bringing the claim. <u>Pa. Gen. Ins. Co. v. Austin Powder Co.</u>, 68 N.Y.2d 465, 470 (1986); <u>see</u> N.Y. C.P.L.R. § 1004 (allowing properly authorized and subrogated insurers to sue in the names of their insureds, although the insured is the real party in interest).

Thus, the anti-subrogation rule does not apply here because the real party in interest asserting the contractual indemnification claim is not the co-insureds' common insurance carrier. Instead, the record shows that Rockledge has assumed the defense of Rudin and 1085. <u>See</u> Movants' Reply Affirmation ¶¶ 52, 55. Rockledge is not the insurer with whom AM&G allegedly arranged to name Movants as additional insureds. <u>See</u> AM&G's Affirmation Opp'n ¶ 3. Therefore, indemnification on the contract's terms would not implicate the policy concerns described above under the anti-subrogation rule.[10] For the above reasons, the anti-subrogation rule does not preclude the indemnification agreed to by the parties, and, accordingly,

---

[10] The cases to which AMG refers in its Affirmation feature subrogated insurance companies as parties in interest, although the named plaintiffs may seem to indicate otherwise. <u>See, e.g.</u>, <u>Maksymowicz v. New York City Bd. of Educ.</u>, 647 N.Y.S.2d 780, 781 (App. Div. 1996). If an insurer were allowed to bring an indemnification claim against its insured, it would target its insured's umbrella or excess policies – thus, it would be unlikely to bring a contractual indemnification claim at all, as those policies usually except liability the insured has assumed by contract. <u>See</u> <u>N. Star Reins. Co.</u>, 82 N.Y.2d at 295-96.

27

Rudin and 1085's motion for contractual indemnification against AM&G is GRANTED.[11]

## VI.  Claims for Lost Wages

Plaintiff alleges that Movants are liable to him for lost future wages because he will be unable to return to work as a laborer due to the injuries he sustained when he fell from the sidewalk bridge.  See Pl.'s Mem. Opp'n at 6.  Movants assert that Plaintiff is not entitled to recover lost wages because Plaintiff is an undocumented alien who obtained employment with AM&G through fraudulent means; to wit, the use of a falsified Social Security card.  See Movants' Mem. L. at 16.

In 1986, Congress enacted the Immigration Reform and Control Act ("IRCA"), Pub. L. No. 99-603, 100 Stat. 3359, codified as amended in scattered sections of 8 U.S.C., which makes it unlawful both for employers to knowingly hire unauthorized aliens, see 8 U.S.C. § 1324a(a), and for unauthorized aliens to knowingly use false documents to obtain employment, see 8 U.S.C. § 1324c(a).  Specifically, with respect to the latter provision, 8 U.S.C. § 1324c(a) provides that:

> It is unlawful for any person or entity knowingly--
> ***
> (2) to use, attempt to use, possess, obtain, accept, or receive or to provide any forged, counterfeit, altered, or

---

[11] Because this Court has granted summary judgment in favor of Movants on Plaintiff's claims for negligence, Movants' claim for contractual indemnification is not premature.  See Watters v. R.D. Branch Assocs., LP, 816 N.Y.S.2d 193, 194 (App. Div. 2006); see also Pollack, 457 F. Supp. 2d at 454.

falsely made document in order to satisfy any requirement of this chapter or to obtain a benefit under this chapter.

8 U.S.C. § 1324c(a).

In 2002, the United States Supreme Court addressed the relationship between IRCA and federal labor law in Hoffman Plastic Compounds, Inc. v. N.L.R.B., 535 U.S. 137. Hoffman involved an undocumented alien, Jose Castro, who was terminated from his employment with Hoffman for supporting efforts to unionize. Id. at 140. Finding that Castro was fired in violation of the National Labor Relations Act ("NLRA"), the National Labor Relations Board ("NLRB") ordered that Hoffman offer Castro reinstatement and backpay, among other remedies. Id. at 140-41. Reviewing the NLRB's grant of backpay, the Supreme Court held that federal immigration policy, as evinced by IRCA, prohibited an undocumented worker like Castro from receiving such an award. Id. at 140. In reaching this decision, the Court emphasized that Castro obtained his employment with Hoffman through the use of false documents,[12] a clear violation of IRCA. See id. at 149-50. Given that Congress had expressly made Castro's conduct criminally punishable, the Court found that there was "no reason to think"

---

[12] Castro admitted that he only gained employment at Hoffman "after tendering a birth certificate belonging to a friend who was born in Texas." Hoffman, 535 U.S. at 141.

that Congress nonetheless intended to permit Castro to be awarded backpay.  Id. at 149.

Subsequently, in Balbuena v. IDR Realty LLC, 6 N.Y.3d 338 (2006), the New York Court of Appeals confronted the related issue of whether IRCA precludes an undocumented alien from receiving an award of lost wages for physical injuries suffered as a result of an employer's violation of state labor law. Thus, unlike Hoffman, Balbuena addressed whether a worker should be allowed to recover future lost wages based on personal injuries suffered during employment, not for backpay due to termination based on unfair labor practices.  Also unlike Hoffman, which addressed the intersection of two federal statutes, Balbuena addressed the intersection of federal law — IRCA — and state labor law.  Thus, at its core, the issue in Balbuena was one of preemption — did national immigration policies require setting aside New York Labor Law's allowance of recovery of lost wages by undocumented workers?[13]  Balbuena's answer was "no."

Observing that there is "compatibility" between federal immigration law and New York State labor law, Balbuena concluded that "IRCA does not bar maintenance of a claim for lost wages by an undocumented alien."  Id. at 360, 363.  The court explained

_____

[13] The New York Court of Appeals has found that "all workers in qualifying employment situations - regardless of immigration status" are entitled to recovery under New York Labor Law.  Balbuena, 6 N.Y.3d at 358-59.

that allowing an award of damages for lost wages against a person responsible for an illegal alien's employment would further both the purposes of IRCA and New York Labor Law.  See id. at 358-60.  Not only would "limiting a lost wages claim by an injured undocumented alien . . . lessen an employer's incentive to comply with Labor Law and supply all of its workers the safe workplace that the Legislature demands," but it "would lessen the unscrupulous employer's potential liability to its alien workers and make it more financially attractive to hire undocumented aliens."  Id. at 359.  In reaching this decision, however, Balbuena emphasized that its conclusion extended only to situations in which the undocumented alien seeking recovery "did not commit a criminal act under IRCA."  Id. at 360.  Although Balbuena stopped short of explicitly stating that an undocumented alien who violates IRCA by using falsified documentation to obtain employment is barred from recovering lost wages under the state labor law, the Court's ultimate holding that "in the absence of proof that plaintiffs tendered false work authorization documents to obtain employment, . . . IRCA does not bar maintenance of a claim for lost wages by an undocumented alien," strongly suggests that is the case.  Id. at 363 (emphasis added).

Shortly after the New York Court of Appeals's decision in Balbuena, the Second Circuit addressed the same issue and

31

reached the same conclusion: federal immigration law does not
prevent an undocumented worker from recovering lost wages in a
personal injury action based on New York Labor Law.  See Madeira
v. Affordable Hous. Found., Inc., 469 F.3d 219 (2d Cir. 2006).
Again, like the Balbuena Court, the Second Circuit emphasized
that its decision was limited to the situation in which the
injured undocumented worker did not violate IRCA by using false
identification to obtain work.  See id. at 223-24.

Therefore, both Balbuena and Madeira make clear that
undocumented workers who suffer physical injury due to an
employer's violation of New York Labor Law and who do not use
false documentation to obtain that employment may recover lost
wages.  However, by explicitly noting that their allowance of
lost wages is limited to workers who do not violate IRCA,
Balbuena and Madiera suggest that workers who do use false
documentation to obtain employment may not recover lost wages
under New York Labor Law.  The Supreme Court's holding in
Hoffman — that backpay is not recoverable in the context of
unfair labor practices for workers who violate IRCA — further
supports this conclusion.  In light of these precedents, this
Court feels compelled to conclude that undocumented workers who
violate IRCA may not recover lost wages in a personal injury

32

action based on a violation of New York Labor Law.[14]  See Macedo
v. J.D. Posillico, Inc., No. 108316/06, 2008 WL 4038048, at *5
(N.Y. Sup. Ct. Aug. 13, 2008) (holding that "plaintiff's
violation of IRCA, by producing a false social security number
in order to obtain employment, bars his claim for lost wages");
Coque v. Wildflower Estates Developers, Inc., 818 N.Y.S.2d 546,
550 (App. Div. 2006) (stating that "an undocumented alien may be
precluded from recovering damages for lost wages if he or she
obtained employment by submitting false documentation to the
employer").

Examination of the facts in this case reveals that
Plaintiff's claim for lost wages must be dismissed because
Plaintiff is an undocumented alien who knowingly used fraudulent
documentation to obtain employment with AM&G in violation of
IRCA.  The parties do not dispute that Plaintiff is an
undocumented alien.  See Compl. ¶ 1; Ambrosi Dep. 9:5-10:6.
Plaintiff admits that he was born in Ecuador, moved to the
United States in August of 2000, and does not have any papers
that allow him to be in this country.  See Ambrosi Dep. 8:17-

---

[14] Although Balbuena and Madiera addressed the ability of an undocumented
worker to recover lost wages — wages a worker will be unable to earn in the
future due to an inability to work — and Hoffman addressed the ability of an
undocumented worker to recover backpay — wages owed to a worker upon
reinstatement for the time period in which he was unemployed due to a
wrongful termination — there is no need to distinguish between the two for
the purpose of this Court's analysis because both backpay and lost wages
implicate the employment relationship, which is governed by the federal
immigration policies of IRCA.

9:22. It is also not disputed that Plaintiff obtained a fraudulent Social Security Card on Roosevelt Avenue in Queens in August of 2003. See Pl.'s Rule 56.1 Stmt. ¶ 17; Ambrosi Dep. 10:7-13:8. Although Plaintiff asserts that there is not enough evidence in the record to conclude that he actually used this false Social Security number to obtain employment with AM&G, see Movants' Rule 56.1 Stmt. ¶ 18; Pl.'s Rule 56.1 Stmt. ¶ 18, Plaintiff's employment records belie this assertion. Examination of both Plaintiff's employment application with AM&G and the W-4 he completed for AM&G reveals that Plaintiff listed his fraudulent Social Security number on both forms. See Movants' Affirmation Ex. N. Furthermore, a photocopy of Plaintiff's fraudulent Social Security card appears among AM&G's employment records. See Movants' Affirmation Ex. N. Based on these documents, Plaintiff clearly used his fraudulent Social Security number to obtain employment, and thus no genuine issue of material fact exists as to whether plaintiff violated IRCA.

Even though Plaintiff used a fraudulent Social Security number to obtain employment with AM&G, Plaintiff nonetheless asserts that his actions did not violate IRCA because he lacked the requisite intent. IRCA requires that a person "knowingly" use false documents to obtain employment. Plaintiff asserts that he did not "knowingly" use false documents as IRCA requires because he believed the Social Security card he obtained and

34

used was valid.  See Pl.'s Rule 56.1 Stmt. ¶ 17.  Plaintiff's

intent argument, however, is contradicted by his own deposition

testimony.  Plaintiff admitted that he obtained his Social

Security card on Roosevelt Avenue in Queens for sixty dollars.

See Ambrosi Dep. 12:5-13:2.  Furthermore, Plaintiff acknowledged

that he did not know where the person who gave him the card

obtained it or if it was even from Social Security.  See id. at

12:22-13:2.  Plaintiff additionally admitted that the number

"could be from another person," thus conceding knowledge that

the card could be fraudulent.  Id. at 13:6-8.  Therefore,

Plaintiff's own statements clearly indicate that he was aware

the Social Security card he obtained was fraudulent.  As a

result, there is no genuine issue of material fact that

Plaintiff possessed the intent required to violate IRCA.

Plaintiff further argues that his lost wages claim should

not be dismissed because there "is no evidence that plaintiff's

employer, AM&G, relied on any representation that the

plaintiff's Social Security card was valid when they hired him."

Pl.'s Mem. Opp'n at 7.  The record, however, belies this

assertion.  AM&G's application form specifically requests that

applicants provide a Social Security number.  See Movants'

Affirmation Ex. N.  AM&G's reliance on the validity of this

number is demonstrated by its use of the number to report

Plaintiff's earnings to the Federal Government.  See Movants'

35

Affirmation Ex. O. Furthermore, there is no requirement that an employer must rely on an employee's false representations before the employee is precluded from recovering lost wages. Although it is true that an employer who does not verify that an employee is authorized to work in the United States violates IRCA, see 8 U.S.C. §§ 1324a(a) & (b), in this case no evidence has been submitted to the Court to indicate that Plaintiff's employer, AM&G, failed to comply with its obligations under IRCA.[15] What has been demonstrated, however, is that Plaintiff violated IRCA by using false documentation to obtain his position at AM&G; any wrongdoing by AM&G does not negate Plaintiff's wrongful conduct.[16]

Therefore, for the reasons stated above, Movants' motion for summary judgment dismissing Plaintiff's lost wages claim is GRANTED. Because Plaintiff's lost wages claim is dismissed, there is no need for this Court to address whether Plaintiff has established the amount of his lost wages with sufficient certainty.

---

[15] Contrary to Plaintiff's assertion that there is "no evidence that AM&G . . . required workers to provide evidence of their legal status to work," Pl.'s Affirmation Opp'n, documents that have been supplied to the Court appear to indicate the opposite. Included among AM&G's employment records are an I-9 Employment Eligibility Verification form and a photocopy of Plaintiff's fraudulent Social Security card as well as a Permanent Resident Card bearing Plaintiff's name. See Movants' Affirmation Ex. N.

[16] Similarly, Plaintiff's payment of federal income taxes does not negate the fact that he violated IRCA by using a fraudulent Social Security number to obtain employment.

## CONCLUSION

For the foregoing reasons, Movants' motion for summary judgment is GRANTED with respect to the contractual indemnification, negligence, Labor Law § 200, and lost wages claims, and DENIED with respect to the Labor Law sections 240(1) and 241(6) claims.  All parties are hereby directed to appear at a pre-trial conference in this matter on October 9, 2008 at 2:00 p.m.


**SO ORDERED:**

_____
BARBARA S. JONES
UNITED STATES DISTRICT JUDGE


Dated:     New York, New York
           September 15, 2008